## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

**Keith Bruchu**                                    **Civil No. 05-2028 JNE/SRN**

       **Plaintiff,**

       **v.**                                    <u>**REPORT AND RECOMMENDATION**</u>

**Jo Anne B. Barnhart,**

       **Defendant.**

---

Mary F. Hastings, Esq., on behalf of Plaintiff

Lonnie F. Bryan, Esq., Assistant United States Attorney, on behalf of Defendant

---

SUSAN RICHARD NELSON, United States Magistrate Judge

       Pursuant to 42 U.S.C. § 405(g), Plaintiff Keith Bruchu ("Plaintiff") seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who determined that Plaintiff was not statutorily disabled and thus not entitled to Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i), 423.

       The parties have submitted cross motions for summary judgment. The matter has been referred to the undersigned United States Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c).

       For the reasons set forth below, this Court recommends that Plaintiff's Motion for Summary Judgment (Doc. No. 8) be denied, and Defendant's Motion for Summary Judgment (Doc. No. 10) be granted.

## I.      BACKGROUND

### A.      Procedural Background

In February 2003, Plaintiff filed an application for DIB, alleging disability from October 29, 2002. (Tr. at 76-78.)  After the denial of his claim at the initial and reconsideration level, he requested a hearing, which was held on June 10, 2004. (Tr. 44-60, 202-61.)  Plaintiff requested review of the ALJ's decision on January 10, 2005 (Tr. at 29-41) and because the Appeals Council denied Plaintiff's request (Tr. at 6-8), the ALJ's findings became the final decision of the Defendant and subject to judicial review. (See 42 U.S.C. § 405(g)).

Plaintiff now seeks review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).  Plaintiff moves for summary judgment in his favor, requesting that the court reverse the Commissioner's decision and award Plaintiff disability benefits, or in the alternative, remand the case for further administrative proceedings before the Commissioner.  Plaintiff argues that the ALJ erred in his assessment of the treating physician sources and erred in his Residual Functional Capacity (RFC) finding.  Defendant moves for summary judgment affirming the ALJ's decision, and dismissing the case with prejudice.

### B.      Hearing Testimony

The following persons testified at the June 10, 2004 hearing: Plaintiff, Social Worker Oswald Shanalingigwa, Medical Expert (ME) Karen Butler, M.D. and Vocational Expert (VE)William Villa.

#### 1.      Testimony of Plaintiff

Plaintiff Keith Bruchu was forty-two years old at the time of the hearing and the ALJ's decision. (Tr. at 206.)  He graduated from high school and had past work experience in a plastic molding company, where he worked for approximately eighteen years.  (Tr. at 211-12.)

2

Plaintiff testified that he was unable to work due to schizophrenia and paranoia.  (Tr. at 206.)

He was able to assist close friends and family members with some tasks, such as sheet rocking or yard

work, but testified that his paranoia made it difficult for him to work for strangers. (Tr. at 207-09.)  He

testified that he had lived with his mother his entire life until she passed away in February of 2004.  Her

death was particularly difficult because she had given him support.  He remained living in the same

house.  At the time of the hearing, his brother and his brother's girlfriend assisted him in household

cleaning, as did his social worker, Oswald Shanalingigwa.  (Tr. at 227.)  Mr. Shanalingigwa made home

visits and helped Plaintiff pay his bills. Id.  He testified that he owned a car, had a driver's license and

had no problems with driving.  (Tr. at 211.)  He was able to cook, do dishes and laundry and shop for

groceries.  (Tr. at 220.)  In addition, Plaintiff testified that after graduating from high school, he received

two years of training in auto mechanics.  Id.

Plaintiff stated that changes in the workplace at the plastic molding job led to his departure.  He

"got tensed up and different foremen come in and tried to change everything 24/7." (Tr. at 212.)  He had

a difficult time communicating with others in the workplace – a problem that intensified with his age:

"Now that I'm getting older I get kind of death defying scared of it or paranoia –  kicks in.  And I don't

know the right words to say and –." Id. at 223.  Regarding the workplace changes, Plaintiff testified:

> I felt like I was getting kind of shafted like because of different changes and not being
> able to understand what they understand.  And I was like, I'm in my world, they're in
> their world and I couldn't cope with that and it was making my illness, get my illness
> more affected.  And the tension and the words of the vocabulary what they said and
> how they say it.  And not understanding like everybody else the – way they do.

(Tr. at 226.)

While changes increased his feelings of paranoia, Plaintiff testified that even absent the

workplace changes, he could not have continued to work there because "the work detail over the past years, it was just getting more difficult and more difficult." Id. at 213.  Plaintiff testified that tension and the feeling that others were out to get him affected his job performance and paranoia.  (Tr. at 231.)  He also testified that he was late three times and sick three times, which resulted in his eventual dismissal from his job at the plastic company.  (Tr. at 227.)

Plaintiff testified that his feelings of paranoia were not related to changes in his medication. (Tr. at 225-26.)  He took his medication, which he found helpful.  Plaintiff received an injection of Haldol every few weeks, which calmed him.  Id.  Prior to being prescribed Haldol, he would hear voices, but he eventually learned how to cope without requiring hospitalization.   (Tr. at 226.)

## 2.      Testimony of Social Worker

Plaintiff's social worker, Oswald Shanalingigwa, testified on his behalf.  Mr. Shanalingigwa saw Plaintiff once every month, but also as needed.  (Tr. at 236.)  Mr. Shanalingigwa testified that he assisted Plaintiff in finding work, but had had difficulty in finding anything suitable.  In Mr. Shanalingigwa's opinion, Plaintiff required a job lasting one hour per day, around people whom he knows and trusts.  Id.

Mr. Shanalingigwa also monitored Plaintiff's mental health, making sure that he took his medication, monitored his home life, in terms of cleanliness and safety, assisted with financial management and scheduled various appointments.  (Tr. at 238-39.)  Mr. Shanalingigwa indicated that the Plaintiff's personal effects are disorganized and his grooming and hygiene are poor.  (Tr. at 240.)  He sometimes reminded Plaintiff to change his clothes or bathe.  Id.  In Mr. Shanalingigwa's opinion, without his assistance or that of Plaintiff's relatives, Plaintiff would not function adequately, and could reach a point where he might pose a danger to himself.  (Tr. at 241-42.)

4

### 3.     Testimony of Medical Expert

Medical Expert (ME) Karen Butler testified that Plaintiff had been diagnosed with paranoid schizophrenia.  (Tr. at 244.)  She testified that hallucinations are considered a positive symptom of schizophrenia, whereas negative symptoms of schizophrenia would include absence of initiative, the inability to motivate oneself and engage in activities independently, and a diminished ability to relate to other people.  (Tr. at 250.)  She concluded that Plaintiff's condition did not meet or equal a listing criteria.  (Tr. at 244-48.)  She noted that the record indicated that Plaintiff had few friends, had some residual paranoia, and could become tangential at times and lose track of thought.  (Tr. at 245.)  She also noted that stress could increase his psychiatric symptoms.  She testified that the medical records showed that medications controlled Plaintiff's delusions, hallucinations and suicidal ideation.  (Tr. at 246.)

As for Plaintiff's work-related limitations, she stated that he needed routine and repetitive tasks, no public contact, contact with a limited number of supervisors and co-workers, and few work changes.  (Tr. at 246-47.)  She testified that while schizophrenia was not a curable disease, its symptoms could be controlled with medication.  (Tr. at 250.)

### 4.     Testimony of Vocational Expert

William Villa testified as a vocational expert.  (Tr. at 253-60.)  ALJ Thomas asked VE Villa the following hypothetical question:

> . . . We're discussing a person, that is a male individual of the age range of approximately 40 to 42 years with apparently 12 years of education and then 2 years additionally of auto mechanics training.  He does have impairments.  He's noted to have diagnoses of schizophrenia, paranoid type.  Also, diabetes, non-insulin dependent, treated with medication.  He had some non-severe or acute conditions.  He had a boil that was treated last August and it's healed.  I think those are the primary impairments.

He has limitations from these primarily from the mental impairments where if I assume
the doctor's limitations he would be limited to work that's routine and repetitive in nature
so as to avoid problems with lapses in concentration.  He would have to be precluded
from having public contact as a part of the job task.  And also be limited in the number
of supervisors and coworkers he would work with.  And, additionally, that he shouldn't
have a lot of changes in his work from day to day.  With those kinds of limitations could
a person with those perform the past jobs that are in your report?

(Tr. at 254-55.)  Mr. Villa responded that such a person could not perform Plaintiff's past jobs.  (Tr. at

255.)  ALJ Thomas then asked if other jobs existed within the region that a person with those restrictions

could perform.  (Tr. at 255-56.)  Mr. Villa testified that in the regional area, there were between 2, 400

- 2,600 laundry worker jobs (DOT 361.684-014) and 2,000 - 2,200 punch press operator positions

(DOT 739.687-030). (Tr. at 256.)

### C.      Medical Records

Plaintiff's motion strictly concerns whether his mental illness qualifies him for Social Security

Disability Insurance.  The ALJ concluded that Plaintiff's physical impairments, diabetes and obesity,

were not severe disabling impairments.  Because Plaintiff does not contest that determination, the Court

reviews only the portion of the record relating to mental illness.

Plaintiff's mental health physician during the time period from October 2002 forward was Dr.

Yijie Dong.  On October 14, 2002, Plaintiff saw Dr. Dong, who noted that Plaintiff had schizophrenia.

(Tr. at 151.)  Plaintiff had come in for an "early" Haldol shot in September because of stress and came

in on October 14, 2002, for another shot.  Plaintiff informed Dr. Dong that his mother had likely had a

mild stroke and that his workplace was expanding in size, from seven persons to forty seven.  While

Plaintiff denied hallucinations, he thought that hearing people talk affected his thinking. He indicated both

that his boss did not have any flexibility and, in contradiction, that his boss was more flexible.  Id.  Dr.

Dong noted that Plaintiff was positive for paranoia, but denied suicidality or homicidality.  He prescribed an injection of Haldol every three weeks instead of every four weeks, as well as continuation with Zyprexa and Zoloft.  Id.

Dr. Dong saw Plaintiff next on December 9, 2002.  "The patient reports that he was laid off a month ago, and he feels miserable."  (Tr. at 150.)  Dr. Dong noted that Plaintiff's mood was depressed, affect was blunt, but that his thought form was coherent and goal-directed.  He continued Plaintiff on prescriptions of Zyprexa and Zoloft and injections of Haldol.  Id.

On December 12, 2002, Dr. Dong's nurse, Rita Johnson, R.N., completed a "Rule 79" case management/diagnostic assessment, part of the application process for Washington County assistance in the management of mental illness.  (Tr. at 135-139.)  Both Nurse Johnson and Dr. Dong signed the form.  The form requested diagnoses along five axes.  Plaintiff's form provided the following diagnoses: Axis I, paranoid schizophrenia; Axis II, borderline intellectual functioning; Axis III, obesity – borderline diabetes; Axis IV, lost job, and Axis V, Global Assessment of Function (GAF) score, 50.  The form indicated that Plaintiff had: (a)  a diagnosis of schizophrenia; and (b) a significant impairment in functioning; and (c) a written opinion from a medical health professional, in the last three years, stating that he was reasonably likely to have future episodes requiring inpatient or residential treatment . . . unless ongoing case management or community support services were provided.  Id. at 135.  Nurse Johnson also noted that Plaintiff lost his job due to an inability to communicate.  "Keith tries very hard to do what is right but gets confused and overwhelmed.  Needs help to ? appeal unemployment and/or SSDI."  Id. at 138.  She also noted, "not overtly psychotic, but does get paranoid at times."  Id.  While it was noted that he had some extended family, Nurse Johnson indicated that he was primarily

responsible for his mother's care at that time.  Id.

On February 10, 2003, Plaintiff saw Dr. Dong.  (Tr. at 148.)  He described Plaintiff as a 40-year-old Caucasian male with thought disorder.  "Since he has been off work, his anxiety has been getting better each day."  He denied hearing voices, but noted that he gets paranoid now and then.  Dr. Dong indicated that Plaintiff's hygiene and grooming were poor, but that his speech was normal, his mood was good, his thought form was coherent and goal-directed and his affect was bright.  Id.

Plaintiff next saw Dr. Dong on April 28, 2003.  His mood was "okay," affect was broad, thought form was linear and he was positive for mild paranoia.  (Tr. at 147.)  Dr. Dong continued Plaintiff on his medications.  Id.

On June 26, 2003, Plaintiff saw Dr. Dong again.  (Tr. at 186.)  Haldol, Zoloft and Zyprexa were continued.  "He is frustrated with his application for SSDI.  He has appealed and is waiting for a court date.  He has an attorney working on his case.  Yesterday, he felt bad and thought about jumping off a bridge, but did not do it.  He said it was just a passing thought."  Id.  Dr. Dong noted that Plaintiff's mood was frustrated and his affect was constricted.  His thought form, however, was coherent and goal-directed.  He had fleeting suicidal thoughts, but denied suicidal thoughts on the day of the examination.  He had paranoia and worries.  Id.

Two months later, on August 21, 2003, Plaintiff again treated with Dr. Dong.  He reported fleeting auditory hallucinations, but the voices did not bother him.  Dr. Dong noted that Plaintiff had been helping his brother, who paid him for his work.  Dr. Dong indicated that Plaintiff was positive for paranoia and worries. (Tr. at 185.)

On November 17, 2003, Plaintiff saw Dr. Dong.  (Tr. at 184.)  He noted that Plaintiff continued

to do odd jobs for his brother and friends.  Plaintiff indicated to Dr. Dong that he had been diagnosed with borderline diabetes.  Dr. Dong reported that Plaintiff's mood was good, affect was constricted, thought form was coherent and goal-directed.  He had residual paranoia and worries.  Id.

Plaintiff saw Dr. Dong on March 9, 2004.  (Tr. at 183.)  He had missed a February appointment due to the death of his mother.  Dr. Dong reported that Plaintiff had good support from his family and friends, though he was more emotional.  Overall, his mood was "okay," his affect was constricted, his thought form was linear and he denied paranoia and hallucinations.  Dr. Dong continued Plaintiff on Haldol, Zoloft and Zyprexa.  Id.

**D.     Other Evaluations**

Also in the record are evaluations from Plaintiff's first Washington County case manager, Charlie Burfeind (Tr. at 144-45), and John Martin, an evaluator at Rehabilitation Services in Stillwater, Minnesota (Tr. at 142.)

In February 2003, Mr. Burfeind noted that Plaintiff had been referred to Washington County Community Services on December 12, 2002 by Dr. Dong.  (Tr. at 144.)  Plaintiff reported having been hospitalized at Regions Hospital and Riverwood Hospital in 1997.  "Based upon a conversation with Therese Gilbertson, Keith is seriously and persistently mentally ill."  Id.  Mr. Burfeind noted that finding employment was one of Plaintiff's long-term goals.  He also remarked upon the strength of Plaintiff's family, i.e., "they are somewhat tight knit and support Keith a tremendous amount at this time."  (Tr. at 145.)

Mr. Martin, a rehabilitation evaluator, met with Plaintiff on January 22, 2003.  He commented upon Plaintiff's poor grooming, stating that it looked as if Plaintiff had been working on a car before his

appointment, as his clothing and hands were soiled with grease.  (Tr. at 142.)  He was wearing a large

stocking hat with weeds stuck in it and had not shaved for several days. "He was quite talkative at times.

He mentions some difficulty with finding words and it was obviously a problem during our interview.  He

would lose track of the subject and the conversation would be more than a little tangential at times."

While Mr. Martin noted that there were obvious indications of a significant mental disorder, he stated

that Plaintiff was capable of interacting fairly well in casual conversations.  Id.  Mr. Martin believed that

Plaintiff tended to under report symptoms of his disorder:

> He would talk of "feeling lots of pins sticking in my back" and "hearing voices." I note
> that he had denied suicidal thinking to his therapist, yet he admits to a serious suicide
> attempt a few months back.  Several times during our interview, he completely lost his
> train of thought and required prompting to get back on track.

Id.

Mr. Martin noted that the fact that Plaintiff had held jobs in the past and had a driver's license

were points in his favor, in terms of finding employment.  On the other hand, Mr. Martin stated that

finding job placement would be difficult due to Plaintiff's chronic and persistent mental illness and very

limited skills.  Id.  "The fact that his impairments are quite obvious is going to be an issue in any

interview.  He also reports that his illness gets really out of control when he is stressed or ill and then he

is not able to work at all."  Id.

## II.    PROCESS OF REVIEW

"The Social Security program provides benefits to people who are aged, blind, or who suffer

from a physical or mental disability."  Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); see also

42 U.S.C. § 1382(a).  A person is disabled if his or her physical or mental condition renders that person

unable to do not only his or her previous work, but also any other kind of substantial gainful employment

that exists in the national economy.  42 U.S.C. § 1382c(a)(3)(B).  The impairment must last for a

continuous period of not less than twelve months or be expected to result in death.  42 U.S.C.

§1382c(a)(3)(A); see also 20 C.F.R. §§ 404.1509, 416.909.

## A.      Administrative Law Judge Hearing

If the initial application for disability benefits is denied, a claimant may request a *de novo*

reconsideration.  20 C.F.R. §§ 404.909, 416.1409.  Any claimant dissatisfied with the reconsideration

may request a hearing before an ALJ.  42 U.S.C. §§ 405(b)(1), 1383(c)(1)(A); 20 C.F.R. §§ 404.929,

416.1429, 422.203.

The ALJ must follow a five-step analysis in determining whether a claimant is disabled:

1.      Has the claimant engaged in substantial gainful activity since the alleged onset disability?
2.      Is the claimant suffering from a medically severe impairment or combination of impairments?
3.      Does the claimant's impairment(s) meet or equal a listed impairment in 20 C.F.R. pt. 404, subpt. P, app. 1?
4.      Does the claimant have the residual functional capacity (RFC) to perform the claimant's past relevant work?
5.      Is there any other work in the national economy that the claimant can perform?

20 C.F.R. §§ 404.1520(b)-(f), 416.920(b)-(f); see also Bowen v. Yuckert, 482 U.S. 137, 140-141

(1987).  Once the claimant demonstrates his impairments prevent him from performing his previous

work, the burden shifts to the Commissioner to prove that jobs exist in the national economy that the

claimant could perform.  O'Leary v. Schweiker, 710 F.2d 1334, 1337 (8th Cir. 1983).

## B.      Appeals Council Review

If dissatisfied with the ALJ's decision, a claimant may request review by the Appeals Council,

which may choose to hear or deny that request.  20 C.F.R. §§ 404.967, 416.1467.  The decision of the

Appeals Council (or the ALJ if the Appeals Council denies the review request) is the final decision of the

Commissioner, and is binding upon the claimant unless appealed to Federal District Court within 60 days

after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981,

416.1481.

### C.     Judicial Review

 Judicial review of the Commissioner's decision is limited to a determination of whether the

decision is supported by substantial evidence in the record as a whole.  Hutsell v. Sullivan, 892 F.2d

747, 748-49 (8th Cir. 1989); see 42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402

U.S. 389, 401 (1971).  The review is "more than a mere search of the record for evidence supporting

the [Commissioner's] finding."  Brand v. Sec'y of the Dep't. of HEW, 623 F.2d 523, 527 (8th Cir.

1980).  Rather, "'the substantiality of evidence must take into account whatever in the record fairly

detracts from its weight.'"  Brand, 623 F.2d at 527 (quoting Universal Camera Corp. v. NLRB, 340

U.S. 474, 488 (1951)).

The reviewing court must review the record and consider:

1.     The credibility findings made by the ALJ,
2.     The Plaintiff's vocational factors,
3.     The medical evidence from treating and consulting physicians,
4.     The Plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments,
5.     Any corroboration by third parties of the Plaintiff's impairments, and
6.     The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989) (citing Brand, 623 F.2d at 527).  A court

may not reverse the Commissioner's decision simply because substantial evidence would support an

opposite conclusion,  Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984), and in reviewing the

record for substantial evidence, the Court may not substitute its own judgment or findings of fact, Woolf

v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  Instead, the court must consider "the weight of the

evidence in the record and apply a balancing test to evidence which is contradictory."  Gavin v. Heckler,

811 F.2d 1195, 1199 (8th Cir. 1987).  If it is possible to draw two inconsistent positions from the

evidence and one of those positions represents the Commissioner's decision, the court must affirm that

decision.  Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).

## III.    THE FINDINGS AND OPINION OF THE ADMINISTRATIVE LAW JUDGE

At the first step of his analysis, the ALJ noted since October 29, 2002, the date of alleged onset

of disability, Plaintiff performed odd jobs for relatives and friends on an intermittent basis.   The ALJ

found that that work activity did not constitute substantial gainful activity since the alleged onset of his

disability.  (Tr. at 30.)

At the second step, the ALJ found that the total evidence established that Plaintiff's paranoid

schizophrenia affected his ability to do basic work activity more than a minimal degree and therefore was

severe.  (Tr. at 31.)

At the third step, ALJ Thomas compared Plaintiff's impairment of paranoid schizophrenia with

the impairments listed in Appendix 1 to Subpart P of the Regulations.  20 C.F.R. § 404.1520(d).   To

assist him in that evaluation, Plaintiff reviewed the medical records and relied upon the testimony of the

impartial ME, Dr. Butler, who opined that Plaintiff's impairment of paranoid schizophrenia did not meet

or equal the criteria of § 12.03 in the Listing of Impairments. (Tr. at 31.)  ALJ Thomas gave Dr. Butler's

testimony great weight, "finding it to be credible, persuasive and consistent with the record as a whole."

ALJ Thomas agreed with Dr. Butler that Plaintiff's symptoms satisfied the requirements of the "A"

criteria of § 12.03, which requires substantiation of the existence of the impairment.  As to the "B"

criteria, ALJ Thomas concluded that they were not met – Plaintiff's functional limitations were moderate,

in that he had moderate difficulties in maintaining concentration, persistence or pace and had no episodes

of decompensation.  (Tr. at 32.)  He noted that Plaintiff had moderate restrictions in his activities of daily

living.  He was able to live alone, drive, clean, cook, do yard work, shop, read magazines, visit and talk

on the telephone.  He based his conclusion on the testimony of Dr. Butler and Plaintiff as well as the

activities questionnaires completed by Plaintiff and his social worker.  (Tr. at 32-33.)

Having concluded that the evidence failed to establish the "B" criteria, ALJ Thomas next

assessed the "C" criteria of § 12.03 and found that the record did not establish any of the "C" criteria for

Plaintiff's paranoid schizophrenia.  Id.   According to Dr. Butler, the evidence failed to establish the

return of hallucinations, because they were controlled by medication.  Id.

ALJ Thomas then briefly addressed whether, assuming Plaintiff demonstrated a diagnosis of

borderline intellectual functioning, such a diagnosis met the Listing of Impairments found in § 12.05.

First, the ALJ noted that the only mention of a diagnosis of borderline intellectual functioning was on the

Rule 79 Case Management form completed by Dr. Dong's nurse and co-signed by Dr. Dong.  (Tr. at

135-140.)  The ALJ stated that none of the other records from Dr. Dong contained this diagnosis.  (Tr.

at 33.)

Section 12.05 of the Listing of Impairments refers to mental retardation and requires significantly

subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period (before age 22.) Id. ALJ Thomas found that the record contained no documentation to support this requirement. Id.

Next, the ALJ determined Plaintiff's Residual Functional Capacity (RFC). (Tr. at 34, 184.) In doing so, the ALJ evaluated Plaintiff's subjective complaints according to Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) as well as the medical records. Id. The ALJ determined that Plaintiff's testimony was only partially credible, finding it not fully consistent with his allegation of a disabling mental impairment that precludes full-time, substantial work. (Tr. at 38.) Plaintiff testified that since October 2002, he performed odd jobs for his brother. He indicated that he could walk one mile and had no problem using his hands. While Plaintiff represented that he quit his job at the plastic bottle shop because changes at work aggravated his paranoia, he also testified that he was dismissed because he was sick three days and late two days. (Tr. at 34.) He testified that he was on medications while working at the bottle plant and that his medications still worked. (Tr. at 35.) He indicated that he had been hospitalized twice four or five years previously for his paranoid schizophrenia, for approximately one month each time. Id. Plaintiff testified that the tidiness of his house was so-so and that he received help from his brother.

ALJ Thomas also considered the testimony of Plaintiff's social worker, Mr. Shanalingigwa. Id. Mr. Shanalingigwa testified that he assisted Plaintiff with his job search, but had not so far been successful. He stated that Plaintiff was easily disorganized and had poor concentration. He believed that Plaintiff could only perform a job for one hour per day, around people he knows and trusts. Mr. Shanalingigwa testified that Plaintiff's grooming was lacking and he did not bathe regularly. When Plaintiff experienced stress, he had anxiety problems, difficulty focusing and feelings of paranoia. Mr.

Shanalingigwa stated that this caused Plaintiff's personal grooming to deteriorate, as well as increased the risk of suicide.  Id.

Following his review of the record and considering all the testimony, the ALJ found that Plaintiff retained the capacity for routine, repetitive, 3-4 step tasks (to avoid problems with concentration), no public contact, limited contact with supervisors and co-workers and few changes in work tasks.  Id.  ALJ Thomas noted that the ME, Dr. Butler, testified that Plaintiff was limited to routine, repetitive tasks, no public contact and limited contact with supervisors and not many changes in work practices.  She testified that Plaintiff had had no periods of decompensation because he had not been hospitalized from October 2002 to the present.  Id.  Dr. Butler found it significant that Plaintiff responded to his medication and that most of his psychiatric symptoms remitted accordingly.  Id.

ALJ Thomas also relied upon the medical records of Dr. Dong, Plaintiff's treating psychiatrist, in determining Plaintiff's RFC.  A review of the records indicated that Plaintiff's medications remained essentially the same from 2002-2004.  Id. at 36-37.  Plaintiff identified fleeting auditory hallucinations at one point, but said that they did not bother him, and at times indicated that he suffered increased anxiety and stress.  Overall, the records showed that Plaintiff's thought form was generally coherent and goal-directed.  Id.

ALJ Thomas noted that Plaintiff submitted records from his inpatient hospitalizations for mental illness, and testified regarding them, "however, these records indicate that the claimant's psychiatric hospitalizations were over 12 years ago and that he did not remain in the hospital over 11 days."  (Tr. at 37.)

ALJ Thomas noted the report from John Martin of Rehabilitation Services (Tr. at 142).  (Tr. at 37.)  Mr. Martin indicated that Plaintiff was capable of interacting well in casual conversation, but noted

obvious indications of a significant mental disorder during their conversation. He stated that Plaintiff tended to under report symptoms of his disorder. Id.

In addition, ALJ Thomas gave some weight to the administrative findings of fact made by the State Agency Medical Consultants, which he viewed as statements from non-examining expert sources. (Tr. at 37.) He found them to be consistent with the record as a whole. Dr. Sharon Frederiksen provided the following RFC: Claimant had the ability to understand, remember and carry out 3- and 4-step tasks with reasonable pace and persistence on a sustained basis to meet production quotas/standards of a routine work setting; was able to tolerate and respond appropriately to the typical levels of supervision found in a routine work setting; was able to tolerate brief and superficial contact with co-workers and the general public; and was able to tolerate routine stressors and changes of a routine, repetitive work setting. (Tr. at 177.)

Finally, ALJ Thomas examined Plaintiff's work history in assessing his credibility. (Tr. at 37.) He noted that despite his mental illness, Plaintiff managed to maintain one job for 18 years. He testified that he worked continually, even in the years containing his two psychiatric hospitalizations. Id. "Thus, the record shows that even with prominent negative symptoms, the claimant was successful in working 10 more years until he was laid off of his job in October 2002." (Tr. at 37-38.)

Based on all of the above, ALJ Thomas gave only partial weight to Plaintiff's testimony, noting in particular Plaintiff's description of his activities and lifestyle, the degree of medical treatment required, efforts to relieve Plaintiff's symptoms, Plaintiff's demeanor at the hearing, reports of treating physicians, his medical history and the findings made upon examination. (Tr. at 38.)

Finally, based on Plaintiff's paranoid schizophrenia, ALJ Thomas found that Plaintiff retained the RFC for routine, repetitive 3-4 step tasks, no public contact, limited contact with supervisors and co-

workers, and few changes in work tasks.  <u>Id.</u>

ALJ Thomas next determined if Plaintiff could perform any of his past relevant work.  The VE, Mr. Villa, determined that Plaintiff's past relevant work was as a utility worker (plastic industry), which is heavy and semiskilled.  <u>Id.</u>  Mr. Villa testified that Plaintiff would be unable to perform his past relevant work because a utility worker performs a multitude of tasks.  The ALJ agreed with the VE's assessment and found that Plaintiff was unable to perform his past relevant work because it exceeded his RFC. (Tr. at 38.)

Finally, the ALJ noted that in VE Villa's opinion, Plaintiff could work as a laundry worker and as a punch press operator.  He indicated that 2,400-2,600 laundry worker jobs existed in Minnesota and 2,000-2,200 punch press operator jobs existed in Minnesota.   ALJ Thomas therefore concluded that Plaintiff still could perform work in the national economy, consistent with his RFC.  (Tr. at 38-39.)

## IV.    DISCUSSION

Plaintiff argues that the ALJ erred by failing to accord sufficient weight to the treating physicians' opinions and by assigning an incorrect RFC.

### A.     The Evaluation of the Opinions of Plaintiff's Physicians

A treating physician's opinion is accorded controlling weight where it is well supported by medically acceptable techniques, and is not inconsistent with other substantial evidence in the record.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).   Nonetheless, whether a claimant is disabled is a determination reserved for the Commissioner, and a statement by a medical source regarding disability is not dispositive.  20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).  Opinions regarding disability are not entitled to the same weight as other medical opinions.  20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3).

"While we recognize that the treating physician is entitled to particular deference, his statements as to the ultimate issue of disability are not controlling."  Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991).

Here, Plaintiff argues that in reaching his conclusion that Plaintiff's paranoid schizophrenia was adequately managed with medication, the ALJ did not accord proper weight to Plaintiff's treating physicians.  In particular, Plaintiff points to records relating to Plaintiff's in-patient hospitalizations and his Global Assessment of Function (GAF) score in 1990, which ALJ Thomas discounted as being outside of the relevant time period and during a time when Plaintiff still managed to work.

The Court agrees with ALJ Thomas's decision to accord these records little, if any, weight. While the hospitalization records indicate that Plaintiff's mental status would deteriorate over time (Tr. at 198) and that his GAF score was 30 in 1990 (Tr. at 193), representing a serious impairment in functioning, the records pre-date Plaintiff's alleged onset of disability by 10-12 years and therefore are not relevant to the period at issue.  ALJ Thomas did not suggest that these records were of no value in determining Plaintiff's impairments, only that they significantly pre-dated Plaintiff's alleged onset date. Notably, there are no mental hospitalizations on record following 1992.  Despite the relatively short-term periods of hospitalization in 1990 and 1992, Plaintiff remained working at that time and continued to work for a decade.

Whatever accounts for Plaintiff's lack of inpatient hospitalizations from 1992 forward, Plaintiff's medical records from 2002-2004 reveal that he responded well to medication.  He had few episodes of hallucination and generally displayed a coherent, goal-directed thought form.  For the most part, he denied suicidality.  He consistently remained on Haldol, Zoloft and Zyprexa and Dr. Dong's "treatment

19

plans" were that Plaintiff simply return every 3 months for medication management.  (See, e.g., Tr. at

184.)  Dr. Dong did not recommend hospitalization or any treatment other than conservative care by

medication.  Nor did Dr. Dong issue any vocational restrictions to Plaintiff.  If anything, the 2002-2004

records from Dr. Dong, along with the lack of hospitalizations, contradict the prognosis offered in 1990

that Plaintiff's condition would deteriorate.

Plaintiff also argues that his 1990 GAF score of 30 (Tr. at 193) demonstrated a severe mental

impairment, which should have been given greater weight by the ALJ.  First, for the reasons discussed

above, the 1990 record is of limited relevance when Plaintiff's alleged date of onset is October 29,

2002.  Second, while such a score may indicate the need for hospitalization, Plaintiff was, in fact,

hospitalized and treated in 1990.  (Tr. at 197-201.)  He showed a "very marked improvement" with

medication.  (Tr. at 198.)  A key factor in his 1992 hospitalization was that he had stopped taking his

medications.  (Tr. at 191-95.)  Once hospitalized, he experienced "marked relief" with medication and

"improved significantly" during his three days of hospitalization.  (Tr. at 193.)  In 2002, Nurse Johnson

and Dr. Dong provided a GAF score of 50, which indicates serious mental health symptoms, but is just

one point lower than moderate.  (Tr. at 135.)

The ALJ took this evidence into account.  ALJ Thomas noted that the only mention of a

diagnosis of borderline intellectual functioning was found on the 2002 Rule 79 form prepared by Nurse

Johnson, and none of Dr. Dong's numerous notes contained this diagnosis.  (Tr. at 33.)   In addition,

ALJ Thomas indicated that Plaintiff had completed high school and had had many years of successful

employment at the semi-skilled level.  (Tr. at 82, 126.)  ALJ Thomas therefore found this diagnosis

generally inconsistent with the record and properly discounted it.

The opinions of physicians who have seen a claimant over a period of time for purposes of treatment are given more weight over the views of consulting physicians.  Williams v. Bowen, 844 F.2d 748, 750-52 (10th Cir. 1988).  The fact that ALJ Thomas discounted the 1990 and 1992 medical opinions offered by short-term hospital treaters and gave more weight to the opinion of Dr. Dong is appropriate for this reason as well.  Although the hospital physicians were not mere consultants, Plaintiff did not have the kind of long-term relationship with them as he did with Dr. Dong.   ALJ Thomas accorded Dr. Dong's opinions proper weight.

Plaintiff also argues that ALJ Thomas erred in giving no reason for accepting ME Butler's opinion "over" that of the treating physicians.  The Court disagrees.  The ALJ gave "Dr. Butler's testimony great weight finding it to be credible, persuasive and consistent with the record as a whole." (Tr. at 31.)  As discussed above, ALJ Thomas properly discounted the 1990 and 1992 medical opinions.  As to the relevant opinions of a treating physician, i.e., Dr. Dong, ALJ Thomas accepted them, giving them proper weight and consideration.  He did not discount or discredit them in any way.  Moreover, Dr. Butler's opinion is not inconsistent with Dr. Dong's opinion.  She reviewed and relied upon those records in forming her opinion that Plaintiff's delusions, hallucinations and suicidality were remitted and controlled by medications.   ALJ Thomas did not accept Dr. Butler's opinion "over" that of Dr. Dong, as their opinions were consistent.

**B.     Determination of Plaintiff's RFC**

Plaintiff argues that ALJ Thomas erred in assessing Plaintiff's RFC, citing the testimony of social worker Oswald Shanalingigwa, Plaintiff's testimony, the records of in-patient hospitalizations and the observations of Plaintiff's first case manager, Charlie Burfeind.

In addition, Plaintiff contends that the ALJ erred by failing to account for Plaintiff's diagnosis of borderline intellectual functioning, as noted in his Rule 79 case management form completed by Nurse Johnson (Tr. at 135).  He argues that ALJ Thomas failed to include this diagnosis in the hypothetical question posed to VE Villa.  Finally, he objects to the VE's determination regarding specific jobs that Plaintiff could perform.

### 1.      Testimony/Subjective Complaints

Evaluation of subjective testimony is based partly on the credibility of the claimant.  Johnson v. Sec'y of HHS, 872 F.2d 810, 812 (8th Cir. 1989).  Therefore, "the ALJ, as fact finder, must make the initial determination."  Id.  The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.  Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001).

In evaluating subjective complaints,

> The adjudicator must give full consideration to all of the evidence
> presented relating to subjective complaints, including the claimant's prior
> work record, and observations by third parties and treating and
> examining physicians relating to such matters as:
> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
> The adjudicator is not free to accept or reject the claimant's subjective
> complaints *solely* on the basis of personal observations.  Subjective complaints
> may be discounted if there are inconsistencies in the evidence as a whole.

Polaski, 739 F.2d at 1322 (emphasis in original).

A claimant's subjective complaints cannot be disregarded solely because no objective evidence supports those complaints.  Northcutt v. Califano, 581 F.2d 164,166 (8th Cir. 1978).  "An ALJ who

rejects a claimant's complaints, however, must make an express credibility determination explaining his reasons for discrediting the complaints." Ghant v. Bowen, 930 F.2d 633, 637 (8th Cir. 1991). Credibility determinations must be supported by substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988).

The ALJ found Plaintiff's subjective complaints regarding his functional limitations only partially credible. (Tr. at 38.)   The ALJ considered the entire record during the relevant time period and, as required, his decision contained "specific reasons" that were supported by the record evidence.  The ALJ considered Plaintiff's daily activities from 2002 forward. See SSR 96-7p referring to 20 C.F.R. § 404.1529(c)(3)(i) (when evaluating the intensity and persistence of a claimant's symptoms and the extent to which a claimant's symptoms limit his or her capacity to work, the ALJ will consider what daily activities a claimant engages in.).   Plaintiff testified that despite having lived with his now-deceased mother all his life, he drove, cooked, shopped, cleaned, did yard work, read and bathed.  He was eligible for Rule 79 case management services and received help with his bills.  (Tr. at 32.)  Plaintiff testified that he had the support of family and some friends, with whom he kept in touch through visits and phone calls.  Id.   Plaintiff testified that he worked at a bottle shop for 18 years trimming plastic on bottles, but quit because changes at work brought on feelings of paranoia.  (Tr. at 34.)

Both Plaintiff and Charlie Burfeind, his former social worker, completed questionnaires regarding Plaintiff's activities of daily living.  The questionnaires confirmed that Plaintiff drove and cooked daily, watched television, did yard work, talked on the phone, groomed and bathed himself on at least a weekly basis, and did housework and fixed things on a monthly basis.  (Tr. at 33.)

ALJ Thomas considered the testimony of Plaintiff's social worker, Oswald Shanalingigwa. He

testified that he worked with Plaintiff to assist him in finding a job, but that they had been unable to find anything suitable.  He believed that Plaintiff required a one-hour per day job around persons Plaintiff knows and trusts.  (Tr. at 35.)  Mr. Shanalingigwa also testified that Plaintiff's grooming and household cleanliness were lacking.  Id.

The ALJ also noted Plaintiff's medications and their positive effect on controlling his mental illness.  He noted that Plaintiff had completed high school and had worked at the same job for 18 years. He considered the testimony of Dr. Butler in formulating Plaintiff's functional limitations.  In sum, ALJ Thomas addressed the Polaski factors in evaluating Plaintiff's credibility.  The fact that he did not give greater weight to certain portions of witnesses' testimony does not render the ALJ's assessment improper.

Plaintiff also argues that his ability to perform some activities of daily living does not equal the ability to perform substantial gainful activity.  (Pl.'s Mem. Supp. Mot. Summ. J. at 10.)  The ALJ did not cite these daily activities as proof that Plaintiff could work, but to show that Plaintiff abilities were not as limited as alleged.  Dr. Butler referred to Plaintiff's daily activities to explain why she believed that Plaintiff's mental condition did not meet or equal a listing.  The ALJ's consideration of Plaintiff's activities of daily living, along with Dr. Butler's reference to them are proper uses of Plaintiff's daily activities.  See 20 C.F.R. § 404.1529(c)(3)(I) (daily activities considered in analysis); Polaski, 739 F.2d at 1322.

The Court does not doubt that Plaintiff experienced some impairment from 2002 to the present. But as long as the ALJ's decision is not based solely on the lack of such evidence, he may disbelieve Plaintiff's subjective reports because of inherent inconsistencies or other circumstances.  Simonson v. Schweiker, 699 F.2d 426, 429 (8th Cir. 1983).  The ALJ is in the best position to gauge the credibility

of testimony in light of the evidence, and his decision is granted deference in that regard.  Estes v.

Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (citing Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir.

2001)).  Thus, the Court finds that the ALJ properly discounted some of Plaintiff's subjective complaints

and there is substantial evidence to support his opinion.

### 2.    Hypothetical Question Posed to VE

Plaintiff argues that the ALJ discounted the significance of Plaintiff's diagnosis of borderline

intellectual functioning and consequently submitted an incomplete hypothetical to VE Villa.  The Court

disagrees.

As discussed *supra*, ALJ Thomas's reason for giving less weight to a diagnosis of borderline

intellectual functioning was supported by the bulk of the medical evidence:  The only mention of this

diagnosis was in the Rule 79 form prepared by Dr. Dong's nurse and Dr. Dong's numerous treatment

notes did not contain this diagnosis.  (Tr. at 33.)  Nonetheless, ALJ Thomas reasonably accommodated

Plaintiff's intellectual abilities in determining his RFC by limiting Plaintiff to routine, repetitive, 3-4 step

tasks.  (Tr. at 40.)    See Warburton v. Apfel, 188 F.3d 1047 (8th Cir. 1999) (hypothetical question

does not need to contain specific diagnostic terms where other descriptive terms adequately describe a

claimant's impairments.)    The Court therefore finds that Plaintiff's impairment was sufficiently taken into

account in the hypothetical question posed to VE Villa and in ALJ Thomas's RFC assessment.

### 3.    VE Villa's Opinion on Potential Jobs

VE Villa identified laundry worker and punch press operator positions as jobs that Plaintiff could

perform.  Plaintiff argues that few such laundry worker jobs exist in Minnesota, yet VE Villa testified that

between 2,400 and 2,600 laundry worker jobs existed in the regional area.  (Tr. at 256.)  The VE

testified that this job type was available to a person who required no public contact and was limited in the number of supervisors and co-workers.  (Tr. at 255.)  Plaintiff also argues that the punch press operator position was beyond his mental capabilities.  VE Villa testified, however, that the jobs he had in mind were unskilled.  The ALJ was entitled to rely upon the testimony of the vocational expert.  See Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999).  The Court concludes that, based on a proper hypothetical, the VE identified jobs consistent with Plaintiff's RFC.

### 4.      Medical Expert's Testimony

Finally, Plaintiff argues that ALJ Thomas improperly relied on the opinion of a non-treating physician, ME Butler, in assessing Plaintiff's RFC.  As noted previously, the opinions of physicians who have seen a claimant over a period of time for purposes of treatment are given more weight over the views of consulting physicians.  Williams v. Bowen, 844 F.2d 748, 750-52 (10th Cir. 1988).  The Court finds that Dr. Butler's opinions are consistent with those of Plaintiff's treating physician, Dr. Dong. Plaintiff argues that Dr. Butler's assessment of Plaintiff's RFC was also inconsistent with the testimony of Plaintiff and his case worker.  The Court disagrees.  Dr. Butler testified that Plaintiff was able to drive, cook, clean house, do yard work, shop, read, independently groom himself and visit with friends and relatives. (Tr. at 245.)  Dr. Butler noted that from December 2000 forward, Plaintiff had been considered eligible for Rule 79 case management services and received assistance with paying his bills and monitoring his mental condition.  She noted that he had the support of his family and a few friends. Id.  In addition, Dr. Butler indicated that Plaintiff had some residual paranoia, could become tangential at times, and could lose track of his thoughts.  Id.  While there is consensus that Plaintiff's personal hygiene and housekeeping skills could stand improvement, and Dr. Butler did not comment on that, her opinion

is consistent with the testimony of others and consistent with the medical records.  ALJ Thomas

accorded Dr. Butler's opinion proper weight in assessing Plaintiff's RFC.

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED that:**

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 8) be **DENIED**; and

2.      Defendant's Motion for Summary Judgment (Doc. No. 10) be **GRANTED**.

Dated:  June 23, 2006

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. LR 72.2 (b), any party may object to this Report and Recommendation by July 7, 2006,  after being served with a copy thereof.  The party shall file with the Clerk of Court, and serve on all parties, a writing which specifically identifies those portions of this Report and Recommendation to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals